**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                                                    Crim. No. 23-1483 MLG

**SERAPHINE WARREN-BEGAY**, *et al.*,

      Defendants.

**UNITED STATES' RESPONSE TO DEFENDANTS' JOINT**
**NOTICE OF BRADY REQUEST AND MOTION TO COMPEL DISCOVERY**

    This matter is before the Court upon Defendants' "Joint Notice of Brady Request and Motion to Compel Discovery."  Doc. 84 ("Motion"). Therein, Defendants request complete disclosure of an investigative file that relates to a multi-defendant criminal matter currently pending trial within this district. *See* Mot., *passim*.  According to Defendants, that file, which relates to a now dismissed and unrelated carjacking charge against John Doe that occurred approximately one year prior to the violent kidnapping in this matter, qualifies under the disclosure rules governing criminal prosecution.  Defendants are misguided.  The Motion should be denied for the reasons that follow.

    **I.**    **BACKGROUND**

    **A.  The Offense Conduct**

    *1)  Defendants Investigate John Doe*

    On March 28, 2021, Defendant Seraphine Warren-Begay ("Seraphine") reported to the Farmington Police Department that her 2005 Chevy Silverado was stolen from the Brentwood Inn in Farmington, New Mexico.  Seraphine and her husband, Defendant Orlando Begay ("Orlando"), both from Utah, were visiting a friend in Farmington, which is why they were residing at the hotel.

Instead of waiting for law enforcement to investigate the theft, Seraphine turned to Facebook and local gossip for answers.  Among the posts, tips, and conversations about the truck, Seraphine began identifying suspects that she believed perpetrated the theft.  Eventually, based on gossip, hearsay, and contradicting eyewitness accounts of a matching truck roaming the Shiprock area, Seraphine set her sights on John Doe.  Armed with an amateur Facebook investigation, and with information obtained from friends and family, Seraphine, along with Orlando, and assisted by her sister, Defendant Josephine Bekay ("Josephine"), and her sister's husband, Defendant Nelton Alex Bekay ("Nelton"), decided to confront John Doe at his home in Arizona.  That is, the Defendants conspired to take justice into their own hands.

Though, the confrontation did not immediately occur.  Seraphine and Orlando first returned home to Utah to continue the homegrown investigation.  While there, Seraphine received Facebook messages regarding John Doe and a red truck that matched the missing vehicle.  In response, Seraphine and Orlando traveled in a black Nissan Pathfinder to Red Valley, Arizona to survey the area and locate John Doe.

Seraphine and Orlando initially refrained from confronting John Doe, instead opting to search the surrounding area for the truck.  While they searched in Arizona, Josephine and Nelton hunted on the New Mexico side of the border, scouring unsuccessfully the Shiprock area for the truck.  With both teams striking out, Seraphine directed Josephine and Nelton to drive to Red Valley, Arizona to meet up.  Josephine and Nelton complied and drove in a black Ram four door truck to Arizona.  But they did not come empty handed:  Josephine brought handcuffs, pepper spray, a metal police baton, and a black Glock 9mm handgun.  Josephine even admitted to test-firing the gun in a secluded area near Beclabito, New Mexico before the they left for Arizona.

2

With everyone together, the group traveled to the area identified to them as John Doe's family compound.

### 2) Defendants Confront John Doe

Once the group arrived at the compound, which consisted of multiple hogans, Seraphine, Josephine, Nelton, and Orlando approached what appeared to be the main house of the lot, where Seraphine attempted entry. However, as the group immediately found out, the main building was not John Doe's house. It instead belonged to a relative of John Doe, who lived there with his two sons. Attempting to breach the wrong house did not deter the group, as Seraphine used threats to successfully elicit from the relative that John Doe lived in a hogan just across the property. With this information, Seraphine continued to the hogan, while Josephine entered the relative's residence and without provocation peppered sprayed everyone inside.[1]  Josephine then used her metal police baton to break out the windows before continuing to the hogan with Seraphine.

Finally, once at the hogan, Seraphine, Josephine, and Orlando breached the door and went straight for an unsuspecting John Doe who slept inside. Nelton remained outside to guard the two vehicles. According to Seraphine, John Doe started to get up once they were inside, so she "hit him over the head" with a police baton as Orlando and Josephine shot him with paintball guns. Seraphine then directed a blood and paint covered John Doe to get outside. There, the group handcuffed John Doe.

### 3) Defendants Kidnap John Doe

After the group handcuffed John Doe and secured him in Josephine and Nelton's Ram truck, which was chosen as the transport vehicle due to its tinted windows, they drove him around

---

[1] The United States notes that this random assault on three members of the Navajo Nation, which likely violates 18 U.S.C. § 113(a)(3), occurred in Indian Country in the District of Arizona.

the Navajo reservation, eventually crossing over into New Mexico.  Seraphine and Orlando followed in the black Nissan Pathfinder.  They forced John Doe to assist in the search while handcuffed, bleeding, and covered in paint.

### 4) Defendants Release John Doe

After approximately 6-8 hours of searching, the group decided to drop John Doe off at the San Juan County Adult Detention Center.  A Deputy from the San Juan County Sheriff's office met the group upon arrival, determined that John Doe needed immediate medical attention, and called for an ambulance.  John Doe was then transported to the San Juan Regional Medical Center for the injuries that he sustained during the kidnapping.

### 5) Defendants Admit to the Conduct

Defendants confessed to the deputies upon arrival at the Detention center.  Then, a few days later, Defendants went voluntarily to the FBI field office in Farmington, where they all signed *Miranda* waivers and again admitted to the kidnapping.  Some highlights include:

- **Seraphine**: "So I went and fricking got a stick.  It's kind of like a stick that comes apart . . . And I took that . . . with . . . a paintball gun, too.  So I carried both of them in there.  I had them both on my hand.  I had the stick on this side. And he was getting up . . . I just hit him over the head, and I was like, 'Where the fuck is my truck?  Give me back my fucking truck.'  And he's all, like, 'I don't have it.  I don't have it.'  And he was getting up again.  That's when I had the paintball, and I shot him.  Then he sat down, and he's all like, 'Ma'am, I don't have your truck.'"
- **Seraphine**: "And I said, 'You know where my truck is.  Give me back my truck.' That was the only time I hit him and assaulted him was that time."
- **Seraphine**: "So he went to the front of the house where I went the first time, but they already like barricaded the door and stuff.  And I was trying to tell them to get out.  I said, 'I ain't going anywhere.  Anybody can call the fucking cops.  Here's the phone.'"
- **Seraphine**: "So I took -- he got into my sister's truck because my car has like blankets and stuff in the back, and I didn't think that -- her windows were tinted. I didn't want like a bunch of seeing[.]"
- **Orlando**: "I kind of knew, I was like, we're going to get in trouble for this, but

-- but the thing was that I wasn't -- I wasn't in control of this, you know.  This is -- this is not my move.  If this was my move, this guy would -- you probably wouldn't even heard of him again."

- **Josephine**: "So I told the guys, I said, 'Don't move.'  I said, 'I got a pepper spray.'  I pepper-sprayed -- when the guy started moving, that's when I pepper-sprayed all three of them."

6) *Consent Search of Seraphine's Phone*

Seraphine also authorized while at the FBI field office a consent search of her cell phone. Among other things, that device provided the following: (1) a video of Defendants yelling at a blood and paint covered John Doe while he was handcuffed in Josephine's Ram truck, (2) photographs of John Doe covered in blood and pink paint, (3) a hand drawn map of John Doe's family compound, (4) surveillance photographs of John Doe's property, (5) screenshots of Facebook posts/solicitations regarding the missing truck, (6) screenshots of John Doe's Facebook account, and a (7) screenshot of directions to John Doe's house

7) *Consent Search of the Vehicles Used*

The following items were located after a consent search of Seraphine's vehicle: (1) purple and black Empire Axe paintball gun with paintballs, (2) black Tippman paintball gun with paintballs, (3) black Daisy Powerline BB gun, and (4) silver handcuffs.

The following items, among other things, were located after a consent search of Josephine's Black Ram pickup truck, which was the transport vehicle: (1) black Glock 9x19 handgun model 26 bearing serial no. SRL547, (2) Glock magazine(s), (3) nine 9mm Luger Ammunition, (4) Smith and Wesson handcuffs, (5) multi-colored brass knuckles, (6) Sabre red pepper spray, (7) Crime Halter pepper Spray, (8) 3-blood swabs, (9) black nylon duty belt with pouches and security badge, (10) black ASP expandable baton, and (11) 2-boxes of Fiocchi 50 count 9mm ammunition, 1-box Fiocchi 20 rounds 9mm ammunition, 1-box CCI Blazer 50 count 9mm luger ammunition.

5

**B. The Charges**

On October 4, 2023, a grand jury charged Defendants for the above conduct in a two-count indictment with: (1) Kidnapping in violation of 18 U.S.C. § 1201(a)(1) and (2) Conspiracy to Commit Kidnapping in violation of 18 U.S.C. § 1201(c).[2]  Among others, an in-custody John Doe testified before the grand jury in support of both charges.  In doing so, John Doe was represented by Noah Gelb of the Federal Public Defender's Office, with all communication regarding the instant matter occurring through Mr. Gelb.

**C. John Doe's Federal Indictment**

Unrelated to the above conduct, on November 23, 2022, a federal grand jury indicted John Doe and a co-defendant for Carjacking Resulting in Serious Bodily Injury in violation of 18 U.S.C. § 2119.  *See* Ex. 1.  That indictment alleges that John Doe and his co-defendant committed the offense on or about May 17, 2020, approximately one year before Defendants kidnapped John Doe.  *Id*.

On January 29, 2024, Mr. Gelb filed an opposed "Motion to Sever Codefendant," arguing that John Doe's criminal matter "presents a classic *Bruton* problem. [John Doe's] co-defendant [] gave a lengthy statement to police inculpating both defendants in the charged carjacking . . . Without an opportunity to confront his accuser, [John Doe] would be severely prejudiced at trial."  *See* Ex. 2.  At the time, trial was set for February 20, 2024.  *See* Crim. No. 22-1910 JB, Doc. 35.

On January 30, 2024, the court presiding over that matter held an omnibus motions hearing, where it ultimately severed John Doe from the co-defendant.  Ex. 3.  However, the Court severed the matter not because of *Bruton*, but instead due to the co-defendant's competency issues.  *Id*.

---

[2] Count 1 also charges Defendants with Aiding and Abetting in violation of 18 U.S.C. § 2.

This, coupled with John Doe's assertion of his speedy trial rights, forced that court's hand on severance. *Id*.

In response to the impending February 20, 2024 trial against John Doe, which pursuant to the court's severance would not feature the co-defendant nor his admission implicating John Doe, on February 5, 2024, the United States filed an unopposed "Motion to Dismiss Indictment Without Prejudice." Ex. 4. The United States "move[d] th[e] Court, pursuant to Federal Rule of Criminal Procedure 48, to dismiss without prejudice the Indictment in this cause filed on November 23, 2022. As grounds for this request, the United States submits that recent developments in this matter, *including the unavailability of the co-defendant for this trial*, have undermined the United States' ability to meet its burden of proof as to the single count of carjacking as to [John Doe]." *Id*. (emphasis added).[3] That same day, the court dismissed the indictment against John Doe. Ex. 5.

On February 8, 2024, during a phone call with counsel for Seraphine, Ryan Villa and Justine Fox-Young, the United States informed counsel that the dismissal was not a product of any agreement between the United States and John Doe for his testimony.[4] On February 9, 2024, the United States formally disclosed to all counsel the unopposed motion to dismiss and the court's order dismissing the indictment without prejudice as to John Doe.

### D. Defendants' Motion

On February 19, 2024, or the day before discovery motions were initially due in this matter in accordance with Rule 45 of the Federal Rules of Criminal Procedure, Seraphine requested *all*

---

[3] The United States notes that John Doe gave no statements to law enforcement regarding the charge.
[4] Villa was already aware of the motion to dismiss and subsequent dismissal, either from Gelb or because he was tracking that docket. Nonetheless, both Villa and Fox-Young informed that the dismissal had nothing to do with the instant matter.

*discovery* in John Doe's unrelated criminal case. Seraphine claimed without more that the "discovery is relevant because if [John Doe] will be testifying in our trial on the heels of your office's dismissal of the case, we think this bears on his credibility." *See* Mot. Ex. 1.

The United States declined at that time to produce any documents underlying John Doe's criminal matter—which was dismissed without prejudice and is still pending trial against a co-defendant—and in rejecting Seraphine's wholesale, unspecific request, granted Defendants an extension to file a motion to compel. *Id*. Then, after further communication with Defendants, which included representations that no cooperation agreement was entered into in exchange for dismissal, and after another continuance of the motions deadline, the United States agreed to completely review the investigative file in light of Defendants' request, where it produced certified records from the New Mexico Judiciary as well as from the New Mexico Corrections Department.

In response, Defendants filed the Motion, arguing that they "are immediately entitled to alleged victim['s] [] carjacking discovery . . . under Rule 16, *Brady* and *Giglio*, and the Due Process Protections Act." Mot. 11. According to Defendants, there is "no question that [John Doe's] discovery is material to the preparation of the Defendants' defenses at trial given the facts and circumstances of both cases and that the discovery contains evidence that will either be admissible under Federal Rules of Evidence 404(a) and (b)." *Id*. at 11–12.

In sum, Defendants state:

> The information sought, including the general discovery and any grants of immunity, cooperation agreements, promises and benefits provided, the pretrial services report, and other criminal history information will reveal not just any agreements [John Doe] has struck with the government and immediate promises and benefits provided – including the dismissal of the carjacking indictment – but also details about [John Doe]'s criminal history, his exposure to a long sentence before and after testifying at the grand jury and other information that bears on the benefits the [sic] he may receive from testifying against the Defendants and that

will likely lead to additional admissible information that will further the Defendants' investigation and implicates [John Doe]'s credibility.

Mot. 17.

Defendants are misguided in their use of immoderate and unsupported rhetoric throughout, which amounts to nothing more than citing authority without analysis. The Motion should be denied for the following reasons.

## II.   ARGUMENT

At the outset, it is important to address the governing legal authority in specific terms rather than Defendants' generic statements of law. Dispositive here is that the law does not allow for a fishing expedition under guise of Rule 16, *Brady*, or *Giglio*. And it does not allow for wholesale disclosure of an unrelated criminal matter's file that in no way relates to the instant charges under 18 U.S.C. § 1201, especially when John Doe's indictment, motion to dismiss, and order of dismissal from that case have already been disclosed. But most importantly, simply citing the disclosure rules without analysis linking how each rule applies to this matter does not translate to disclosure.

### A.   Relevant Law

#### 1.   Rule 16

Federal Rule of Criminal Procedure 16(a)(1)(E) provides that the government must disclose to the defendant, upon his request, papers, documents, photographs, and objects, among other things, "if the item is within the government's possession, custody, or control and: (i) the item is material to preparing the defense; (ii) the government intends to use the item in its case-in-chief at trial; or (iii) the item was obtained from or belongs to the defendant." Fed. R. Crim. P. 16(a)(1)(E). But "Rule 16 does not authorize a blanket request to see the prosecution's file," and

a defendant may not use the rule to engage in a "fishing expedition." *United States v. Maranzino*, 860 F.2d 981, 985–86 (10th Cir. 1988) (citing *Jencks v. United States*, 353 U.S. 657, 667 (1957)).

That is, "[t]he prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." *United States v. Bagley*, 473 U.S. 667 (1985).  In order to successfully compel discovery under Rule 16, the Tenth Circuit requires a criminal defendant "to make a prima facie showing of materiality." *United States v. Cates*, 73 F.4th 795, 814 (10th Cir. 2023).  "Neither a general description of the information sought nor conclusory allegations of materiality suffice; a defendant must present facts which would tend to show that the Government is in possession of information helpful to the defense." *Id*.  The term "defense" means an argument in response to the prosecution's case-in-chief, *i.e.*, an argument that refutes the government's claims that the defendant committed the crime charged.  *See United States v. Armstrong*, 517 U.S. 456 (1996).

To show materiality, the evidence must bear some abstract logical relationship to the issues in the case such that pretrial disclosure would enable the defendant significantly to alter the quantum of proof in his favor.  *United States v. Lloyd*, 992 F.2d 348, 350–51 (D.C. Cir. 1993). This materiality requirement is not a heavy burden; rather, evidence is material as long as there is a strong indication that the evidence "will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal." *Id*. at 351 (internal quotations omitted).  Nevertheless, ordering the production by the government of discovery without any preliminary showing of materiality is inconsistent with Rule 16.  *Mandel*, 914 F.2d at 1219; *Jordan*, 316 F.3d at 1250 (noting that defendant must make specific request for item together with explanation for how it will be helpful to defense).

2. *Brady*

In *Brady v. Maryland*, the Supreme Court held that due process requires the prosecution to disclose evidence favorable to a defendant when such evidence is material to guilt or punishment. 373 U.S. 83, 87 (1963). *Brady*'s favorability and materiality standards are stringent. Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985); *see also United States v. Bencs,* 28 F.3d 555, 560 (6th Cir. 1994) ("materiality" pertains to the issue of guilt or innocence, not to the defendant's ability to prepare for trial). Additionally, "[t]o be material under *Brady*, undisclosed information or evidence acquired through that information must be admissible." *Banks v. Reynolds*, 54 F.3d 1508, 1521 n.34 (10th Cir. 1995) (citation omitted).

 In discussing the limitations of *Brady*, the Supreme Court explained the following:

> If everything that might influence a jury must be disclosed, the only way a prosecutor could discharge his constitutional duty would be to allow complete discovery of his files as a matter of routine practice. Whether or not procedural rules authorizing such broad discovery might be desirable, the Constitution surely does not demand that much . . . [Prosecutors] are under no duty to report *sua sponte* to the defendant all that they learn about the case and about their witnesses . . . [T]here is no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case. The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish "materiality" in the constitutional sense.

*United States v. Agurs*, 427 U.S. 97, 109-10 (1976) (internal citations and quotations omitted).

Significantly, only expressly and obviously exculpatory material falls under the rubric of *Brady*. As the Tenth Circuit has noted:

> The Government has no obligation to disclose possible theories of the defense to a defendant. If a statement does not contain any expressly exculpatory material, the Government need not produce that statement to the defense. To hold otherwise would impose an insuperable burden on the Government to determine what facially non-exculpatory evidence might possibly be favorable to the accused by inferential reasoning. We are confident that the Supreme Court did not intend the *Brady* holding to sweep so broadly.

*United States v. Comosona,* 848 F.2d 1110, 1115 (10th Cir. 1988); *see also United States v. Buchanan,* 891 F.2d 1436, 1441 (10th Cir. 1989). The Court has further cautioned against a whimsical application of *Brady*, noting "[t]he mere possibility that evidence is exculpatory does not satisfy the constitutional materiality standard." *United States v. Fleming*, 19 F.3d 1325, 1331 (10th Cir. 1994).

With regard to "impeachment" evidence, *Brady* does not require the government to provide all information that may impeach a witness' testimony, but instead requires that the impeachment information, like all *Brady* information, be material to the question of a defendant's guilt. *Bagley,* 473 U.S. at 676; *see also United States v. Thompson*, 606 F. App'x 920, 923 (10th Cir. 2015) (unpublished); *Buchanan,* 891 F.2d at 1443-44. In other words, the evidence must be substantially impeaching "so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." *Bagley,* 473 U.S. at 676; *see also Kyles v. Whitley,* 514 U.S. 419, 434 (1995) (must put whole case in such a different light as to undermine confidence in the verdict). Moreover, if the impeachment evidence is merely cumulative, or a witness is but a minor part of the government's evidence, *Brady* does not require its disclosure. *See Thompson*, 606 F. App'x at 923. Furthermore, the Tenth Circuit has noted that "the Due Process Clause does not require the government to disclose before trial the names of its witnesses, just so the defense can have sufficient time to investigate their backgrounds for impeachment information." *United States v. Ashley*, 274 F. App'x 693, 697 (10th Cir. 2008).

Notably, *Brady* is not a pretrial discovery rule. *United States v. Gray*, 648 F.3d 562, 567 (7th Cir. 2011); *see also United States v. Kendall*, 766 F.2d 1426, 1440 (10th Cir. 1985) (citing cases for the proposition that *Brady* does not create any new pretrial discovery privileges). Courts addressing the issue have uniformly held that *Brady* neither requires the United States to perform discovery on behalf of a defendant nor authorizes a defendant to attempt to use *Brady* as an investigative tool. *See, e.g., United States v. Baker*, 1 F.3d 596, 598 (7th Cir. 1993) ("Certainly, *Brady* does not require the government to conduct discovery on behalf of the defendant."); *United States v. Webb*, 651 F. App'x 740, 744 (10th Cir. 2016) (unpublished) (holding that *Brady* does not create a requirement that the government "disclose information it is unaware of and that is in the possession of a separate federal agency not involved in the prosecution or investigation of the present case"); *United States v. Morris*, 957 F.2d 1391, 1402-03 (7th Cir. 1992) (defense motion for disclosure of FBI 302 reports on general and unsupported assertion that *Brady* entitled them to have the reports properly denied by trial court); *United States v. Williams-Davis*, 90 F.3d 490, 513 (D.C. Cir. 1996); *United States v. Romo*, 914 F.2d 889, 898-99 (7th Cir. 1990) (defense motion to require government to make inquiries of local police involved in investigation lacked any indication that exculpatory information would be found).

Ultimately, it is the prosecutor's role to determine what must be disclosed under *Brady* and its progeny, with the accompanying risk of reversal if a mistake is made. *See United States v. Presser*, 844 F.2d 1275, 1281 (6th Cir. 1988) ("[T]he government typically is the sole judge of what evidence in its possession is subject to disclosure and it acts at its own peril by failing to comply adequately with an order requiring disclosure of *Brady* material."); *Banks v. Reynolds*, 54 F.3d 1508, 1517 (10th Cir. 1995). That the duty to disclose rests on the prosecution reflects the recognition that the Constitution "does not grant criminal defendants the right to embark on a

'broad or blind fishing expedition among documents possessed by the Government.'" *United States v. Mayes*, 917 F.2d 457, 461 (10th Cir. 1990) (quoting *Jencks v. United States*, 353 U.S. 657, 667 (1957)); *see also Pennsylvania v. Ritchie*, 480 U.S. 39, 59 (1987) (explaining that a defendant's mere allegation that the requested information might be material does not entitle him to an unsupervised search of the government's files); *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) (noting that there "is no general constitutional right to discovery in a criminal case").

    *3. The Governing Charge*

Now turning to the instant charge for guidance on materiality, the law makes it a crime to unlawfully kidnap another person and then transport that person in interstate commerce. The Tenth Circuit instructs as follows:

> First: the defendant, knowingly acting contrary to law, kidnapped the person described in the indictment by [seizing] [confining] [inveigling] him as charged;
>
> Second: the defendant kidnapped the person for some purpose or benefit;
>
> Third: the defendant willfully transported the person kidnapped; and
>
> Fourth: the transportation was in interstate [foreign] commerce [the offender traveled in interstate [foreign] commerce or used the mail or any means, facility, or instrumentality of interstate [foreign] commerce in committing or in furtherance of the offense].

10th Cir. Pattern Jury Instructions § 2.55 (2021).[5]

With this background, as discussed in the paragraphs that follow, it becomes clear that Defendants' arguments in favor of disclosure fall short of the quantum necessary under Rule 16, *Brady*, the Due Process Protections Act, and *Giglio*.

---

[5] The United States focuses on the substantive elements of kidnapping and not conspiracy.

### B. Analysis

#### 1. The United States Understands its Discovery Obligations

It is important to note before addressing the rules as applied to this matter that the United States is aware of its obligations under Rule 16, *Brady*, and *Giglio* and will continue to comply. More specifically, the United States is not aware of any qualifying information in the case, and certainly none that it has not disclosed.  Absent a more specific, non-speculative request for material that actually constitutes *Brady,* Rule 16 material, or *Giglio* the United States requests that the Court rely on the United States' representations that it has and will continue to comply with its discovery obligations. *See United States v. Fitzpatrick*, 2018 WL 1061434, at *4 (D.N.M. Feb 23, 2018) ("The Court should rely on the government's representations of its compliance with *Brady* unless the defendant shows cause to question them and the materiality of the evidence sought."); *United States v. Sneed,* 34 F.3d 1570, 1580–81 (10th Cir. 1994) (holding that mere speculation that tapes of conversations were exculpatory was insufficient to require further court inquiry where government denied existence of exculpatory tapes).

In sum, John Doe's indictment and motion to dismiss satisfy Rule 16, *Brady*, and *Giglio*.

#### 2. There are no Cooperation Agreements or Grants of Immunity in this matter and the United States cannot produce John Doe's Pretrial Services Report

##### a) Dismissal of John Doe's criminal matter

With that said, there are some arguments in the Motion that can be summarily disposed of at the outset.  For starters, even after the United States notified Defendants that there are no cooperation agreements, and that the prosecutor in John Doe's matter gave his reasons for dismissal on the record, Defendants argue that, "[m]iraculously, the government moved to dismiss the indictment against [John Doe] several months after his appearance at the grand jury citing 'recent developments' and its concern about its 'ability to meet its burden of proof' on the

carjacking charge."  Mot. 15.  Defendants claim that, "[w]ithout access to [John Doe]'s discovery, [] Defendants have no way to determine the strength of the government's case against him or what the 'recent developments' were that lead to the dismissal of the indictment.  Surely, the government would not have indicted [John Doe] without being confident in its ability to prove he committed the carjacking in Shiprock beyond a reasonable doubt.  Defendants are permitted to determine the strength of the evidence against [John Doe] in his similar criminal case which was haphazardly dismissed after his grand jury testimony in this case."  *Id*.  Unfortunately for Defendants, the law and circumstances surrounding the dismissal tell a different story.

Putting aside that Defendants fail to cite authority supporting that they are entitled to determine the strength of the evidence in an unrelated criminal case, not that they could establish such a task is exculpatory, material, or furthers any defense, Defendants are not prosecutors.  But more importantly, the United States has already disclosed documents (or they are publicly available) that explain why the case was dismissed without prejudice: (1) the co-defendant was severed due to competency issues, therefore eliminating admissible statements against John Doe under *Bruton* and its progeny and (2) John Doe simultaneously asserted speedy trial rights, therefore foreclosing a joint trial.  *See* Exs. 1-4.  These facts, supported both by motion and order or the court, do not support the proposition that John Doe's matter was "[h]aphazardly dismissed."  Instead, the facts clearly indicate an informed prosecutorial decision based on diminished evidence, where pursuant to the court's ruling admissible statements under *Bruton* turned into inadmissible hearsay.  *See* Exs. 2–3.

But more to the point, the dismissal in no way was the product of any agreement, whether via a cooperation, grant of immunity, or otherwise, which would require disclosure under *Giglio*. It again resulted from a prudent decision by the prosecutor, not "miraculously" based on nefarious

facts that do not exist.  This understanding is further supported by John Doe's grand jury transcript, which was disclosed on October 27, 2023 (Seraphine, Josephine, and Nelton) and December 13, 2023 (Orlando).  Therein, John Doe confirmed under oath that the United States made no promises of leniency in his criminal matter in exchange for his testimony.  And as already represented to opposing counsel, in the time between John Doe's grand jury testimony and the dismissal of his indictment there have been no agreements or grants of immunity between the United States and John Doe.

This argument therefore provides no basis for disclosure because there is not a cooperation agreement nor grant of immunity in place between the United States and John Doe, either of which would fall under Rule 16, *Brady*, and *Giglio*.  Without more, Defendants' argument fails.

  *b) John Doe's PSR*

The Court can likewise dispose of Defendants' argument related to John Doe's PSR, for that disclosure obligation remains with the Court and not with the United States.  Indeed, the Pretrial Report contains an admonition stating: "Pretrial Reports are not public record and are not to be reproduced or disclosed to any other party and shall remain confidential as provided in Title 18 § 3153(c)(1)."  Section 3153(c)(1) states "[e]xcept as provided in [§ 3153(c)(2)], information obtained in the course of performing pretrial services functions in relation to a particular accused shall be used only for the purposes of bail determination and shall otherwise be confidential."  Under § 3153(c)(2), exceptions to the confidentiality of such information must be made to permit access: (A) by qualified persons for purposes of research related to the administration of criminal justice; (B) by persons under contract under 18 U.S.C. § 3154(4); (C) by United States probation officers for the purpose of compiling presentence reports; (D) to the attorney for the accused and the attorney for the government, to the extent that such information is a pretrial diversion report;

and (E) in certain limited cases, to law enforcement agencies for law enforcement purposes. Those exceptions are not applicable here. Thus, to obtain this document Defendants must motion the Court (pretrial services) as it is the author and distributor of this information.

3.  *The Sentencing Guidelines and/or John Doe's Exposure do not Translate to Compelled Disclosure*

Defendants' next argument related to some arbitrary need to calculate John Doe's potential Guidelines range is similarly infirm. Defendants here claim "without this information about [John Doe's] criminal case, Defendants have no way to determine what his anticipated guideline range would be if convicted of the carjacking, which implicates his willingness to testify at the grand jury against the Defendants and whether he was incentivized by the belief that the government would take a more favorable view of his carjacking case and anticipated sentence." Mot. 15. As stated above, The United States already disclosed John Doe's grand jury testimony.

Now, turning to the actual rules, an unadopted Guidelines calculation in no way enables Defendants to significantly alter the quantum of proof in their favor. *See Lloyd*, 992 F.2d at 350–51. Nor does a Guidelines calculation "play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal." *Id*. at 351 (internal quotations omitted). That Defendants desire to know John Doe's potential Guidelines range does not translate into a prima facia showing of materiality under Rule 16. *Mandel*, 914 F.2d at 1219; *Jordan*, 316 F.3d at 1250 (noting that defendant must make specific request for item together with explanation for how it will be helpful to defense). And Guidelines do not provide a basis for impeachment.

The Tenth Circuit has held that "[i]t is fundamental that it is not permissible to impeach a witness on a collateral or irrelevant matter elicited on cross-examination." *United States v. Warledo*, 557 F.2d 721, 726 (10th Cir. 1977). Rule 608(b) prohibits "prov[ing] by extrinsic

evidence" a "specific instance[ ] of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness." *United States v. Velarde*, 485 F.3d 553, 561 (10th Cir. 2007).  Parties may only introduce specific instances of conduct which might bear upon their truthfulness "by asking the witness on cross-examination about the incident, not by introducing documents or calling other witnesses." *United States v. Beltran-Garcia*, 338 F. App'x 765, 770 (10th Cir. 2009) (unpublished).  "The reason for excluding such extrinsic evidence is to avoid mini-trials that may consume a disproportionate amount of time and confuse the issues." *Velarde*, 485 F.3d at 561.

As applied here, neither the carjacking charge nor John Doe's potential guidelines bear truthfulness.  Because the law forbids Defendants from going into the Guidelines or the alleged carjacking, the only cognizable basis for impeachment here is simply to ask John Doe on cross-examination why his case was dismissed.

This conclusion makes sense given that a Guidelines range is an advisory baseline crafted by the Court and not pursuant to defense counsel's math.[6]  Not only does this truly open the door to a "mini-trial" on extrinsic evidence, or rather "mini-sentencing" with defense counsel now attempting to prosecute John Doe, but any attempt to estimate Guidelines via an unrelated investigative file is in no way exculpatory, *i.e.*, how do the Guidelines negate an element of the offense or establish bias in ways that John Doe's indictment, the corresponding statutory maximum under 18 U.S.C. § 2119, or the dismissal do not.  And Defendants already have that information.  For all intents and purposes, that is sufficient for anything Defendants are trying to do here.

Defendants are not entitled to John Doe's criminal case file based on this theory.

---

[6] The Guidelines are not calculus.  Defendants have the indictment, which gives them the base offense level and bodily injury (clearly indicating that something was used to commit the offense –*i.e.*, an enhancement).  They have John Doe's criminal history, which gives them his criminal history category.  Aside from maybe one enhancement, if any, they already have enough information to craft an estimate of what John Doe's potential Guidelines range would be.

4. *Rule 404 does not trigger the United States' disclosure obligation*

    a) *Rule 404(a)(2)(B)*

Defendants' next basis for disclosure completely lacks authority and demonstrates a misunderstanding what the governing elements are and what a pertinent trait is.  Beginning with Rule 404(a), the Federal Rules of Evidence provide that at trial a defendant may adduce "evidence of an alleged victim's *pertinent trait*."  Fed. R. Evid. 404(a)(2)(B) (emphasis added).  If and only if the trait is pertinent to the instant charges, "proof [of character] may be made by testimony as to reputation or by testimony in the form of an opinion."  *Id*. (citing Fed. R. Evid. 405(a)).  And "in cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense," a defendant may present evidence of specific instances of conduct.  *United States v. McMahan*, 394 F.App'x 453, 463 (10th Cir. 2010) (unpublished) (citing Fed. R. Evid. 405(b) and *United States v. Talamante*, 981 F.2d 1153, 1156 (10th Cir. 1992)).

Here, there is nothing about John Doe's character that is pertinent under 18 U.S.C. § 1201 (see jury instruction above).  For one, Defendants do not even identify a pertinent trait in this case, let alone one that negates an essential element or provides a defense.  *See, e.g.*, *United States v. Toledo*, 985 F.2d 1462, 1469 (10th Cir. 1993) (consent before interstate travel as an elemental attack); *United States v. Leveille*, No. 18-CR-2945-WJ, 2023 WL 5984384, at *9 (D.N.M. Sept. 14, 2023) (parental exception as affirmative defense) *United States v. Torres*, No. 1:19-CR-3333-WJ, 2023 WL 2604950, at *4 (D.N.M. Mar. 22, 2023) (same).  Or to put the argument in more straightforward terms, this matter is not analogous to homicide charge where a victim's trait can establish self-defense.  John Doe's alleged propensity to steal vehicles, whether valid or not, is irrelevant to charge. That is, interstate kidnapping is interstate kidnapping, regardless of an underlying vehicle theft.  Or with respect to the instant discovery request, whether John Doe

carjacked someone a year prior.  Simply trying to latch on to John Doe's alleged conduct as a backdoor way under Rule 404(a) to validate Defendants' actions under § 1201 is nothing short of inappropriate.

Accordingly, opinion testimony or specific instances of conduct, such as the alleged carjacking underlying John's Doe's indictment, or any of his other acts for that matter, are wholly inadmissible and immaterial to the defense under Rule 404(a).  It therefore follows that Rule 404(a) cannot and does not allow for unrestricted discovery into the entire investigative file of the alleged carjacking matter.  Nonetheless, even if this rule did apply, which it does not, the indictment itself would be sufficient here.

> b)  Reverse 404(b)

Turning to reverse 404(b), Defendants' argument still fails to gain traction.  This section allows evidence of a non-defendant witness' bad acts "for defensive purposes if it tends, alone or with other evidence, *to negate the defendant's guilt of the crime charged against him*."  *United States v. Montelongo*, 420 F.3d 1169, 1174 (10th Cir. 2005) (emphasis added) (quoting *Augshi v. Duerr*, 196 F.3d 754, 760 (7th Cir. 1999)).  "[A]dmissibility of reverse 404(b) evidence depends on a 'straightforward balancing of the evidence's probative value against considerations such as undue waste of time and confusion of the issues.'"  *Id*. (quoting *United States v. Stevens*, 935 F.2d 1380, 1404-05 (3d Cir. 1991)).

Here, it is irrelevant under 18 U.S.C. § 1201 whether a year prior to the kidnapping John Doe allegedly carjacked someone.  *See, e.g., United States v. Tony*, No. 16-CR-02904 MV, 2022 WL 594882, at *3 (D.N.M. Feb. 28, 2022) ("Mr. Tony may not present evidence of the alleged victim's previous incarceration with Mr. Tony or Mr. Tony's family members . . . this fact has no bearing on the instant offense or Mr. Tony's belief that self-defense was warranted.  These periods

of joint incarceration have no bearing on the alleged victim's propensity for violence, and Mr. Tony has offered no persuasive reason to suggest otherwise.  Thus, the alleged victim's previous incarceration does not tend 'to negate the defendant's guilt of the crime charged against him,' and is therefore not admissible as reverse 404(b) evidence. (citing *United States v. Montelongo*, 420 F.3d 11689, 1174)); *see also United States v. Pistotnik*, 2019 WL 2233310, at *3 (D. Kan. May 23, 2019) ("In most cases the probative value of reverse 404(b) evidence will be slight 'as it may just amount to pointing a finger at someone else who, having a criminal record, might have committed the crime the defendant is accused of committing.'").  That is, Defendants' guilt remains unchanged even if John Doe committed that offense—the alleged carjacking does not call into question the identity of the kidnappers, point to the *modus operandi* of another, or reduce Defendants' knowledge, intent, or anything else relevant under the law.

In more certain terms, the elements are not called into question simply because Defendants believed that John Doe stole Seraphine's truck from a Farmington hotel parking lot.  It is therefore further irrelevant under § 1201 that John Doe may have carjacked someone a year prior.  Bad guy or not, guilty of a prior carjacking or not, there is no defense or investigative lead that John Doe's criminal file can provide that the indictment itself cannot.  That is, you do not get a free pass under the law to solicit information via Facebook, drive across state lines, assault someone with dangerous weapons, handcuff that person, and then take that person on a multi-state ride looking for your missing truck all because you thought that, based on an amateur investigation, he was the one who stole the vehicle.  So why does it matter under Rule 404(b)'s exception to character evidence that John Doe may have carjacked someone a year prior, especially when Defendants would have no knowledge of this incident.

As stated above, John Doe's alleged conduct cannot be used as reverse 404(b) to justify and/or make Defendants' conduct seem morally acceptable under § 1201. Dispositive here is that John Doe's character is not an essential element of the charges—and the Tenth Circuit has continually emphasized that such evidence may be used only when character is in issue in a "strict sense." *Perrin v. Anderson*, 784 F.2d 1040, 1045 (10th Cir. 1986).

5. *Jury Nullification*

Given the above, the only cognizable use of that material based on the instant charges would indicate that Defendants are masquerading a jury nullification defense as an alternative but unspoken basis for discovery. Unfortunately for Defendants, the Tenth Circuit has held that "there is no right to jury nullification." *Crease v. McKune*, 189 F.3d 1188, 1194 (10th Cir. 1999). As already noted in this District:

> "the powers of juries to 'nullify' or exercise a power of lenity is just that -- a power; **it is by no means a right or something that a judge should encourage or permit if it is within his authority to prevent**." 116 F.3d at 615. Moreover, the Tenth Circuit has held that "the law is clear: a criminal defendant is not entitled to have the jury instructed that it can, despite finding the defendant guilty beyond a reasonable doubt, disregard the law." *United States v. Rith*, 164 F.3d 1323, 1337 (10th Cir. 1999). *See United States v. Powell*, 955 F.2d 1206, 1213 (9th Cir. 1992) (holding that criminal defendants are "not entitled to jury nullification instructions").

*United States v. Young*, 403 F. Supp. 3d 1131, 1148 (D.N.M. 2019) (emphasis added).

## III.   CONCLUSION

In sum**,** "[t]he United States is [] in the best position to determine whether it possesses any *Brady* material [or other discoverable information], and the Court is not in a position to override the United States' judgment." *See United States v. DeLeon*, 426 F. Supp. 3d 878, 921 (D.N.M. 2019). But that aside, Defendants cannot make a *prima facie* showing under Rule 16 nor can Defendants establish how *Brady* or *Giglio* apply in this matter, which revolves around a heinous kidnapping that transpired over three states, involved weapons, and occurred after several days of

amateur sleuthing on Facebook.  The United States respectfully requests that the Court deny the Motion.

Respectfully submitted,

ALEXANDER M. M. UBALLEZ
United States Attorney

*Electronically filed on March 29, 2024*
MATTHEW J. McGINLEY
ELISA C. DIMAS
Assistant United States Attorneys
201 3rd Street, Suite 900
Albuquerque, New Mexico 87102
(505) 346-7274

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 29, 2024, I filed the foregoing document electronically through the CM/ECF system. Pursuant to the CM/ECF Administrative Procedures Manual, §§ 1(a), 7(b)(2), such filing is the equivalent of service on parties of record.

*/s/*
MATTHEW J. McGINLEY
Assistant United States Attorney